IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 1, 2021

## LARRY LEE JOHNSON v. STATE OF TENNESEE

**Appeal from the Criminal Court for Shelby County**
**No. 98-06749      James M. Lammey, Jr., Judge**

_____

**No. W2020-00753-CCA-R3-ECN**

_____

The Petitioner, Larry Lee Johnson, appeals from the Shelby County Criminal Court's summary dismissal of his petition for writ of error coram nobis, wherein he claimed that first coram nobis counsel refused to amend the original coram nobis petition after discovery of two witnesses' statements that might have led to a different result had they been available at trial. The Petitioner contends that the coram nobis court erred by summarily dismissing his petition as having been untimely filed and for failing to state a cognizable claim for relief. Following our review, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Larry Lee Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Amy P. Weirich, District Attorney General; and D. Justin Prescott, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case relates to the November 3, 1997 shooting death of Kelvert Hailey ("the victim") that took place on Levi Road in Memphis. Thereafter, the Petitioner and his co-defendant Johnie Jefferson were tried jointly for the victim's murder. See State v. Johnie Jefferson and Larry Johnson, Nos. W1999-00747-CCA-R3-CD and W2000-01970-CCA-R3-CO, 2001 WL 1218287, at *1 (Tenn. Crim. App. Oct. 21, 2001), perm. app. denied (Tenn. Mar. 11, 2002).

At their trial, Marcus Rydell Glass, who had been charged with facilitation of the victim's murder, testified that he witnessed the Petitioner and co-defendant Jefferson shoot and kill the victim. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *2-3. Co-defendant Glass testified that he was a member of the Gangster Disciples, along with the victim, the Petitioner, and co-defendant Jefferson. According to co-defendant Glass, the victim had violated one of the rules of the organization, and the punishment was death. Co-defendant Glass testified that he, the Petitioner, and co-defendant Jefferson took the victim to a deserted area on the night of November 3, 1997, and that the Petitioner and co-defendant Jefferson shot the victim as he tried to run away. Co-defendant Glass stated that he witnessed the entire incident. Co-defendant Glass further testified that the Petitioner shot the victim twice in the back with a .357 revolver, that co-defendant Jefferson shot the victim four times with the same gun, and that co-defendant Jefferson then got his 9mm pistol and shot the victim twice more.

In addition, Robert Walker testified that he held the position in the Gangster Disciples of "chief security" of the city and reported directly to the "overseer," Tony Phillips. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *3. Mr. Walker also said that co-defendant Jefferson was a "chief of security" in charge of enforcement and that the Petitioner and co-defendant Glass were co-defendant Jefferson's assistants. Mr. Walker testified regarding the gang's membership, structure, procedures, and how specific violations were handled, including murder. According to Mr. Walker, the victim was in trouble for a violation that was punishable by death.

Relative to the events of November 3, 1997, Mr. Walker testified that the Petitioner and co-defendant Glass arrived at Mr. Walker's sister's residence in the Petitioner's car carrying the victim. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *4. When the Petitioner informed Mr. Phillips that the victim was in the car, Mr. Phillips told co-defendant Jefferson to "take care of his business" and winked his right eye, which signified that co-defendant Jefferson was supposed to "put [the victim] to sleep." According to Mr. Walker, co-defendant Jefferson, armed with a .357 revolver, then left with co-defendant Glass and the Petitioner, and as Mr. Walker walked outside with the group, the Petitioner told Mr. Walker that "he was fixing to go kill dude."

The Petitioner and co-defendant Jefferson both testified in their own defense. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *6-7. Both men testified that they did not know each other before their arrests for the victim's murder; co-defendant Jefferson claimed that he had never met the victim; and the Petitioner alleged that he had only met the victim once. Co-defendant Jefferson could not provide an alibi for the time of the murder, and the Petitioner claimed he was with his brother on the night of the murder, though the Petitioner's brother did not testify regarding the Petitioner's whereabouts that evening.

The jury convicted both men as charged of first-degree premediated murder, and they were sentenced to life imprisonment. This court affirmed the convictions on direct appeal, and the Tennessee Supreme Court denied permission to appeal. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *1. A full recitation of the underlying facts surrounding the victim's murder can be found in this court's opinion on direct appeal. See id. at *1-7.

The Petitioner sought post-conviction relief, alleging that he received the ineffective assistance of counsel because his attorney failed to request an instruction on second-degree murder as a lesser-included offense of premeditated first-degree murder and did not raise the trial court's failure to give such instruction as an issue in the motion for new trial. Larry Johnson v. State, No. W2006-00345-CCA-R3-PC, 2007 WL 2120184, at *1 (Tenn. Crim. App. July 24, 2007), perm. app. denied (Tenn. Dec. 26, 2007). At the post-conviction hearing, trial counsel explained that he did not request a second-degree murder instruction because it was inconsistent with the theory of defense—the Petitioner said he was not there, and there was no proof that would support a second-degree murder charge. Id. at *8. Trial counsel also said that the Petitioner gave him the names of possible alibi witnesses, but no one could provide an alibi. The post-conviction court denied relief, and this court affirmed the post-conviction court's determinations, concluding that the Petitioner had failed to establish that he was prejudiced by trial counsel's actions. Id. at *11.

On June 12, 2014, the Petitioner filed his first petition for writ of error coram nobis, alleging that the State "violated 'Brady' by withholding exculpatory evidence of leniency that was given to . . . 'Robert Walker' in exchange for his testimony." Larry Johnson v. State, No. W2017-00503-CCA-R3-ECN, 2019 WL 211172, at *6 (Tenn. Crim. App. Jan. 15, 2019), perm. app. denied (Tenn. May 17, 2019). The petition also alleged that the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963), by withholding impeachment information related to the leniency Mr. Walker received for his cooperation with the State in multiple homicide cases involving defendants who were Gangster Disciples members. The petition alleged that Mr. Walker's federal grand jury testimony showed that Mr. Walker and then-Assistant District Attorney General Terry Harris, the prosecutor in the Petitioner's case, "discussed cooperation and consideration . . . at a later date." Likewise, the petition alleged that Mr. Walker implicated himself in the victim's murder, that Albert Cleveland Wilson's police statement implicated Mr. Walker in the unrelated homicide of Billy Ray Brown, and that Mr. Walker was never charged for his roles in these killings. The Petitioner argued that due process of law required tolling the one-year statute of limitations.

The coram nobis court's March 3, 2017 written order reflected that the court denied relief for failing to state a cognizable claim, reasoning that the trial transcript showed that the federal grand jury transcript was provided to the defense during the trial. The court

also found that Mr. Wilson's statement implicating Mr. Walker in an unrelated murder would not have been admissible at the Petitioner's trial and that even if Mr. Wilson's statement would have been admissible, the statement would not have impacted the outcome of the trial. Finally, the court determined that Mr. Wilson's statement could have been discovered by trial counsel at the time of trial.

This court affirmed on appeal, noting first that the petition was filed long after the statute of limitations had expired, and then concluding that the record failed to establish what, if anything, in the grand jury transcript was withheld from the defense, so the Petitioner could not establish that the evidence was newly discovered. Larry Johnson, 2019 WL 211172, at *16. This court continued,

> Furthermore, because evidence of what consideration the prosecutor provided to Mr. Walker does not exculpate the Petitioner of the first-degree murder of Mr. Hailey and because co-defendant Glass testified at the trial that the Petitioner shot Mr. Hailey twice in the back when Mr. Hailey attempted to run, it is unlikely that the jury would have reached a different judgment had it been presented evidence of Mr. Walker's bias based upon consideration provided by the prosecutor.

Id. Given these conclusions, this court found it "unnecessary to consider the coram nobis court's determinations relative to Mr. Wilson's 1998 police statement implicating Mr. Walker in the murder of Mr. Brown." Id. at *17.

On May 31, 2019,[1] the pro se Petitioner filed his second pro se petition for writ of error coram nobis. This time, he claimed that on June 2, 2016, he obtained new, exculpatory evidence in the form of two statements from both Tony Phillips and Melisha Looney. According to the Petitioner, the State violated Brady by withholding these exculpatory statements prior to trial, thereby entitling him to coram nobis relief. The Petitioner submitted that these statements were "vital to [his] actual innocence claim," reflecting that he "was not present during the planning of this alleged crime" and that he was not "in the room before, during[,] or after the alleged crime of murder." In addition, the Petitioner argued that due process required tolling of the one-year statute of limitations because his appointed counsel in the prior coram nobis proceeding ("first coram nobis counsel") refused to amend the Petitioner's original coram nobis petition to add these additional claims, despite the Petitioner's request that he do so. The Petitioner attached a letter from first coram nobis counsel dated June 2, 2016, stating that the Petitioner should

---

[1] The Petitioner claimed that he had previously mailed the petition on March 8, 2017. He attached two certified mail receipts showing packages sent to the District Attorney General's Office and the Shelby County Criminal Court on that date.

- 4 -

have received the "[s]tatements from the prosecutor's file" already, though first coram nobis counsel said that he would send them again out of an abundance of caution.

The Petitioner also filed a supplement to this petition, in which he purported to provide additional factual context for his claims. In the supplement, the Petitioner seemingly focused on facts he believed might have led to a different judgment, including the possibility of conviction for a lesser-included offense, had all the exculpatory evidence been available to him at trial. The Petitioner challenged the credibility of co-defendant Glass and Mr. Walker, and the Petitioner asserted that the withheld statements supported his alibi defense.[2] At some point, the coram nobis court appointed new counsel ("second coram nobis counsel") to represent the Petitioner in this matter.

The Petitioner attached the witnesses' statements to his coram nobis petition. Relative to Mr. Phillips, Mr. Phillips made a statement to the authorities on November 13, 1997. In that statement, Mr. Phillips claimed that he was no longer the overseer of the Gangster Disciples in Memphis, having his authority "stripped" from him six months prior. In addition, Mr. Phillips averred that he had nothing to do with the victim's death and implicated "MacLarry" (the Petitioner), "Sporty" (co-defendant Glass), and "J-Rock" (co-defendant Jefferson) as the individuals "responsible for the death" of the victim.

In his second statement given on November 17, 1997, Mr. Phillips admitted that his first statement was not "completely true" and that he was still the overseer of the Gangster Disciples in Memphis. According to Mr. Phillips, he first learned of the victim about a month to a month and one-half before the murder during a conversation he had with another gang member, "Honeysuckle." During this conversation, Mr. Phillips learned that the victim had been "causing a lot of chaos and doing a lot of robbing, bringing heat down by robbing, etc." Honeysuckle indicated to Mr. Phillips that the members were going to call a meeting to discuss what repercussions the victim was to face for his actions. After the meeting took place, Mr. Phillips was informed that they agreed to give the victim a "pumpkin head" for violating the rules of the gang, which meant a "physical violation," "[a] couple of mouth shots, about [six] or [seven]." Mr. Phillips stated that on the day of the murder, Sporty stopped by his residence and told him that they were "fixin' to go handle some business." J-Rock, who was present at Mr. Phillips's apartment, left with Sporty. The victim's body was found the following morning, so Mr. Phillips deduced that this was the business they had handled the prior evening. When Mr. Phillips was asked if he knew if anyone else was "involved in this murder," he said, "MacLarry. Y'all got him down here, so I guess he's been implicated too, y'all came and got his car."

---

[2] In addition to the statements from Mr. Phillips and Ms. Looney, the Petitioner also referenced statements from Kim Moss, co-defendant Jefferson, and Marlo Richardson. However, no statements from these witnesses appear anywhere in the record.

Relative to Ms. Looney ("MeMe"), she gave a statement to the authorities on November 9, 1997. Ms. Looney said that she returned to her apartment on November 3, 1997, around 4:30 or 5:00 p.m. and that upon her return, Ms. Looney's roommate and her roommate's "play sister" were in the living room talking with the victim. Ultimately, Ms. Looney went to her bedroom where she stayed for the evening. Sometime around 8:00 p.m., Ms. Looney's roommate informed Ms. Looney that they were leaving to take the roommate's children "home." Ms. Looney was then alone with victim. Ms. Looney indicated that she last saw the victim in her apartment about 9:15 or 9:30 p.m. that evening when he left to "to get a beer and to find some weed." Ms. Looney thought the victim intended to return to apartment. Ms. Looney's roommate later told her that "some guy" picked the victim up and left. Ms. Looney admitted that she did not know if others entered the apartment that evening because she was in her bedroom. Ms. Looney denied knowing the Petitioner.

In her second statement given later the same day, Ms. Looney admitted that the Petitioner was her boyfriend and confirmed that the Petitioner, the victim, and co-defendant Jefferson ("Sporty") were all members of the Gangster Disciples. When asked about the relationship between Sporty, the Petitioner, and the victim, Ms. Looney said that the Petitioner told her not let the victim into her apartment because members of the Gangster Disciples were "following" the victim and "were going to kill him and all witnesses." The Petitioner further informed her that Sporty had been looking for the victim for about a year because the victim "was initiating folks" into the gang without the authority to do so. She further conveyed that the Petitioner and the victim had had a disagreement about the Petitioner's "shooting a gun downstairs from [her] apartment."

Relative to the events that took place on November 3, 1997, Ms. Looney relayed that she and the Petitioner met around 4:00 p.m. that day and rode around in the Petitioner's car, stopping in Germantown to visit her mother. When they got back to Ms. Looney's apartment around 7:00 p.m., they discovered that the victim was inside, so they left to go inform Sporty. According to Ms. Looney, she and the Petitioner returned to the apartment complex accompanied by Sporty, and they dropped Sporty "off around the corner" from her apartment. Once Ms. Looney and the Petitioner arrived at her apartment about 9:00 p.m., Ms. Looney got out of the vehicle and went inside, but the Petitioner stayed in the car and did not come inside. Ms. Looney relayed that "[a] couples of minutes" after she had returned to the apartment, Sporty entered and greeted the victim with a handshake. Ms. Looney said that the last time she saw the victim in her apartment was around 9:30 p.m. when the victim left to "get some beer and buy some weed" and that Sporty left shortly after the victim.

According to Ms. Looney, the Petitioner called her around 11:00 p.m. and said that he "would be over after a while." When Sporty and the Petitioner returned the following

morning, November 4, about 1:00 or 1:30 a.m., Sporty said to her, "MeMe, we were with you all night, OK?" Later that day, Sporty told Ms. Looney that he was "spooked" and that "his gun had been drilled."

Ms. Looney conveyed that she asked the Petitioner if he killed the victim and that the Petitioner told her that he did not. Ms. Looney speculated that Sporty was responsible for the victim's murder.

The State filed a motion to dismiss. In the motion, the State argued that (1) the petition was untimely and due process did not require tolling of the statute of limitations; (2) the Petitioner only offered a bare allegation that the evidence was newly discovered; and (3) the evidence, even if newly discovered, was inculpatory rather than exculpatory and would not have led to a different result at trial.

Second coram nobis counsel explained that while the witnesses' statements did not definitively establish the Petitioner's innocence, they did "give some wiggle room, . . . that would have allowed for a sounder, more robust alibi defense." Counsel also indicated that the statements, though not providing a specific alibi, could have established that the Petitioner was not as "involved in the planning of" the victim's murder contrary to the testimony from the State's trial witnesses.

The Petitioner stated that first coram nobis counsel spoke with post-conviction counsel and that post-conviction counsel said that he had never seen these statements. The Petitioner claimed that first coram nobis counsel would not amend the first petition for coram nobis relief, though the Petitioner did not know why he refused. The Petitioner further explained that the matter was brought before the coram nobis court during the first coram nobis proceeding[3] and that the court said that it "was only going to deal with what was on paper and how long he had had the statement," which was five months. The Petitioner also claimed that trial counsel told him that he could not find Ms. Looney or Mr. Phillips.

The State noted that the Petitioner had sent co-defendant Jefferson an affidavit relieving co-defendant Jefferson of any involvement in the victim's murder; thus, the Petitioner had established he was present for the murder through his own affidavit. The State believed that the affidavit had been entered in co-defendant Jefferson's coram nobis proceedings. See Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *14-15 (affirming trial court's determination that the affidavit lacked "believability and credibility" and denying the coram nobis petition); see also Johnie Jefferson v. State, No. No. W2012-01867-CCA-R3-PC, 2013 WL 5519721, at *8 (Tenn. Crim. App. Oct. 2, 2013), perm. app. denied (Tenn. Feb. 11, 2014). Second coram nobis counsel stated that

---

[3] The same judge presided over both coram nobis proceedings.

- 7 -

at an evidentiary hearing, the Petitioner would be able to explain that he authored the affidavit while in jail because his family was being threatened.

The coram nobis court observed that open-file discovery was a "pretty common" practice in the jurisdiction at the time of the Petitioner's trial. The court took the matter under advisement.

On February 25, 2020, the coram nobis court entered an order dismissing the petition. Regarding the statute of limitations, the court noted that the Petitioner only offered a bare allegation that he was not provided these documents as part of pre-trial discovery. In addition, the court found it appeared that he was aware of these documents as early as 2015[4] when he was shown them by first coram nobis counsel, which suggested that first coram nobis counsel did not find them to be newly discovered given his refusal to amend the petition. The court determined that the Petitioner had failed to establish that he was denied a reasonable opportunity to present his claims. Moreover, the court found that even if the petition were timely and the evidence newly discovered, the Petitioner failed to state a cognizable claim for relief. According to the court, the Petitioner had failed to demonstrate that had the evidence been presented to the jury, it might have resulted in a different outcome at trial. The court observed that Mr. Phillips's statement was inculpatory and that Mr. Phillips would have been subject to significant attack by the State if he testified. As for Ms. Looney, the court explained that her statement was "equally unhelpful" because she could not say if someone entered the house after she retreated to her bedroom. The Petitioner filed a timely notice of appeal on May 21, 2020.[5]

## ANALYSIS

On appeal, the Petitioner argues that the coram nobis court erred by summarily dismissing the petition because the statute of limitations should be tolled in this matter and the statements were exculpatory in nature. As for the statute of limitations, the Petitioner submits that due process requires tolling because the statements were discovered while the Petitioner was represented by first coram nobis counsel, who refused to amend the original coram nobis petition. The Petitioner notes that he is prohibited by law from filing any pro se pleadings while represented by counsel. He claims that because he requested that first coram nobis counsel amend the petition, he is without fault in failing to present the evidence at the proper time. In addition, the Petitioner asserts that the evidence was newly discovered and that it may have resulted in a different judgment, potentially a lesser-

---

[4] It is unclear how the coram nobis court obtained this year. The Petitioner claimed that he received the statements in 2016.

[5] As a result of the COVID-19 pandemic, the deadline for the Petitioner's notice of appeal was extended through June 5, 2020. In re: Covid-19 Pandemic, No ADM2020-00428 (Tenn. Apr. 24, 2020).

included offense, had it been offered at trial. The Petitioner explains that Mr. Phillips's statement, though it does implicate the Petitioner, also establishes "not so much a planned murder, but a planned assault," which may have negated the requisite mens rea for first-degree murder. Relative to Ms. Looney's statements, the Petitioner states that her second statement provides a "solid timeline" for the day and evening of the shooting, including the times that both the Petitioner and the victim were with her, as well as providing an incriminating admission from co-defendant Jefferson. The Petitioner concludes that the statements from the witnesses, taken together, could have been viewed by the jury as supporting facilitation or some other lesser-included offense. The Petitioner requests reversal for a full evidentiary hearing.

In response, the State notes the coram nobis court's finding that first coram nobis counsel's refusal to amend the petition "seems to suggest that counsel did not find [the statements] to be newly discovered." Next, the State asserts that even if the statements were newly discovered, the second writ of error coram nobis petition was untimely, its being filed nearly two decades after the entry of the final judgment, and that due process does not require tolling because the Petitioner waited nearly three years after obtaining the statements to present his claim. The State explains that a claim of ineffective assistance of counsel does not justify tolling the statute of limitations for coram nobis relief and that nothing prohibited the pro se Petitioner from filing a second petition for writ of error coram nobis. Finally, the State submits that the newly discovered evidence would not have led to a different result at trial because it is not exculpatory. The State observes that neither Mr. Phillips nor Ms. Looney testified at the Petitioner's trial, so their newly-discovered statements had no impeachment value. In reference to Mr. Phillips's statements affecting the jury's consideration of lesser-included offenses, the State notes that the jury was not charged with any lesser-included offenses. Relative to Ms. Looney, the State remarks that she was the Petitioner's girlfriend, so he likely had access to her, and that, regardless, her statements are not proof of actual innocence. The State explains that her statements in fact discredit the Petitioner's testimony at trial that he did not know Mr. Phillips and co-defendant Glass were members of the Gangster Disciples and that he had only met the victim once.

A writ of error coram nobis is an extraordinary remedy available only under very narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105; see State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The purpose of a writ of error coram nobis is to bring to the court's attention a previously unknown fact that, had it been known, may have resulted in a different judgment. State v. Vasques, 221 S.W.3d 514, 526-27 (Tenn. 2007). The decision to grant or deny the writ rests within the

discretion of the coram nobis court.  Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988).

A petition for writ of error coram nobis must be filed within one year of the date the judgment of the trial court becomes final.  See Tenn. Code Ann. §§ 27-7-103, 40-26-105. The statute of limitations is calculated from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely, post-trial motion.  Payne v. State, 493 S.W.3d 478, 484 (Tenn. 2016); Mixon, 983 S.W.2d at 670.  A petition for a writ of error coram nobis may be summarily dismissed if it fails to show on its face that it has been timely filed because the timely filing requirement in Code section 27-7-103 is an essential element of a coram nobis claim.  Nunley v. State, 552 S.W.3d 800, 828 (Tenn. 2018).  "[T]he statute of limitations set forth in Section 27-7-103 is not an affirmative defense that must be specifically raised by the State in error coram nobis cases; instead, the coram nobis petition must show on its face that it is timely filed."  Id.

The one-year limitations period may be tolled only when required by due process concerns.  See Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001).  To determine whether due process requires the tolling of the statute of limitations, courts must balance the State's interest in preventing "stale and groundless claims" against the petitioner's interest in having a hearing to present newly discovered evidence which may have led to a different outcome at trial.  Id.  Courts apply the following three-step analysis to balance those interests:

(1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would have normally commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).  Whether a claim is time-barred is a question of law, which this court reviews de novo.  Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010).

Upon review, we cannot conclude that the coram nobis court abused its discretion in summarily dismissing the petition for writ of error coram nobis.  First, there is no dispute that the Petitioner filed this petition outside the limitations period and that the State raised the statute of limitations as an affirmative defense.  Here, the Petitioner was convicted of first-degree murder in 1999.  This court affirmed his conviction on October 12, 2001, and our supreme court denied permission to appeal on March 11, 2002.  This second petition

for writ of error coram nobis was not filed until May 31, 2019, well past the one-year filing deadline.[6]

The Petitioner claims due process requires tolling because he did not see the witnesses' statements until 2016, when shown them by first coram nobis counsel, who refused to amend the original coram nobis petition to include allegations related to the statements. However, review of the second and third considerations in Sands indicate that due process tolling of the statute of limitations does not apply in this case. The Petitioner's claim is not clearly "later-arising," nor would a strict application of the limitations period deny the Petitioner a reasonable opportunity to present the claim.

The Petitioner was aware of information pertaining to Ms. Looney and Mr. Phillips before and at the time of trial. Ms. Looney was the Petitioner's girlfriend. At trial, Sergeant R.D. Roleson of the Memphis Police Department testified that he talked with Ms. Looney following the victim's murder at the homicide office and that he had her page the Petitioner, and Sergeant Roleson then used the return call to trace the Petitioner's location. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *5. Sergeant Roleson stated that officers went to that location and had the Petitioner's car towed for processing. Subsequently, officers obtained a search warrant for the Petitioner's vehicle based on information from a "reliable witness" who, in part, identified the Petitioner and co-defendant Glass as the persons responsible for the victim's murder. As for Mr. Phillips, the Petitioner testified that Mr. Phillips sometimes cut his hair and that he was at Mr. Phillips's residence when the police paged him. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *7. Ms. Raniko Lindsey Bonner testified at trial that she was dating Mr. Phillips at the time of the victim's murder; relayed that the Petitioner and co-defendants Glass and Jefferson all came to Ms. Bonner's home on the night of the murder while Mr. Phillips was present; that the Petitioner told her he could not give her a ride because "he had some business to take care of"; and that subsequently the Petitioner and co-defendants Glass and Jefferson left. Id. at *1. Co-defendant Glass and Mr. Walker also testified about their relationship with Mr. Phillips and Mr. Phillips's involvement in the events surrounding the victim's murder. Id. at *2-4. Totti Brown, Mr. Phillips's roommate, testified that the Petitioner and co-defendant Jefferson frequently came to her apartment to see Mr. Phillips. Id. at *5.

At the brief coram nobis hearing, second coram nobis counsel asserted that he had reviewed "the old case filings and transcripts and things of that nature" and acknowledged that it appeared the statements from Mr. Phillips and Ms. Looney were included "in the State's original first-degree murder file." The coram nobis court observed that open-file discovery was a "pretty common" practice in the jurisdiction at the time of the Petitioner's

---

[6] Even if the Petitioner originally mailed the petition on March 8, 2017, as he asserted, it was still filed well past the deadline.

trial. Regarding the statute of limitations, the coram nobis court in its written order noted that the Petitioner only offered a bare allegation that he was not provided these documents as part of pre-trial discovery. In fact, the June 2, 2016 letter attached by the Petitioner from first coram nobis counsel references them as "[s]tatements from the prosecutor's file." We agree that the Petitioner's bare allegation is insufficient based upon the record before us.

According to the Petitioner, trial counsel told him that he could not locate either Mr. Phillips or Ms. Looney, but the failure to locate these witnesses or present their statements was not addressed as an issue at trial or in the post-conviction proceedings. The Petitioner claimed that first coram nobis counsel spoke with post-conviction counsel and that post-conviction counsel said that he had never seen these statements. However, there is not even a bare allegation that these statements were not available to post-conviction counsel through due diligence. In addition, trial counsel stated at the post-conviction hearing that the Petitioner gave him the names of possible alibi witnesses, but no one could provide an alibi. See Larry Johnson, 2007 WL 2120184, at *8. Any claim that Petitioner's delay in raising the claim should be attributed to the ineffective assistance of post-conviction counsel is without merit. "'[T]here is no constitutional right to effective assistance of counsel in post-conviction proceedings.'" Stokes v. State, 146 S.W.3d 56, 60 (Tenn. 2004) (quoting House v. State, 911 S.W.2d 705, 712 (Tenn. 1995)). Even if a constitutional right did exist, ineffective assistance of counsel is not an appropriate ground for coram nobis relief. See Mindy Dodd v. State, No. M2013-02385-CCA-R3-ECN, 2014 WL 1605168, at *3 (Tenn. Crim. App. Apr. 22, 2014) (holding that the petitioner's claims of ineffective assistance of trial counsel is not an appropriate ground for coram nobis relief). Most significantly, however, "[a] claim of ineffective assistance of counsel does not justify tolling the statute of limitations for coram nobis relief." James Dellinger v. State, No. E2013-02094-CCA-R3-ECN, 2015 WL 4931576, at *12 (Tenn. Crim. App. Aug. 18, 2015).

The Petitioner asserted that first coram nobis counsel refused to amend the original petition, but could provide no rationale for first coram nobis counsel's decision. In addition, the Petitioner claimed that this matter was brought to the attention of the coram nobis judge in the original coram nobis proceeding, and though the Petitioner disagreed with how the coram nobis court dealt with the situation, it was not raised as an issue on appeal. Even if the Petitioner did not see the statements until shown them by first coram nobis counsel, this does not make them newly discovered.

Finally, we agree with the coram nobis court that the Petitioner's claims of newly discovered evidence that may have led to a different result at trial, including the possibility of conviction for a lesser-included offense, are unconvincing. Neither Ms. Looney nor Mr. Phillips testified at trial, so their statements would have had no impeachment value. The coram nobis court observed that Mr. Phillips's first statement was inculpatory and that Mr.

Phillips would have been subject to significant attack by the State if he testified. Also, the jury was not charged with any lesser-included offenses, so any assertion that Mr. Phillips's statements may have led to a conviction for a lesser-included offense are without merit. We note that the lack of these instructions and the failure to preserve the issue was not found to be prejudicial to the Petitioner. See Larry Johnson, 2007 WL 2120184, at *11. As for Ms. Looney, the coram nobis court explained that her first statement was "equally unhelpful" because she could not say if someone entered the house after she retreated to her bedroom. Moreover, her second statement did little to support the Petitioner's defense because it, in fact, discredited the Petitioner's trial testimony that he did not know that Mr. Phillips and co-defendant Glass were members of a gang and that he had met the victim only once. The second statement was also inculpatory in that Ms. Looney informed that she and the Petitioner alerted co-defendant Jefferson to the victim's whereabouts and brought co-defendant Jefferson to her apartment, knowing of his plans for retribution. Ms. Looney ultimately could not account for the Petitioner's whereabouts during the murder in either version of her statements. We conclude that no "reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Vasques, 221 S.W.3d at 527.

## CONCLUSION

Accordingly, we conclude that the coram nobis court did not err in summarily dismissing the petition for writ of error coram nobis. In consideration of the foregoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE